432 A.2d 1092

**Cloyd HIMES, Al's Tire Service, Allegheny Foundary Company, Cambria Slag Division of the Standard Slag Company, Emporium Trust Company, New Enterprise Stone and Lime Company, Patton Lumber and Supply, Pennsylvania Electric Company, United Survey Company, and Warren Concrete Products**

v.

**CAMERON COUNTY CONSTRUCTION CORPORATION**

v.

**CARROLLTOWN BOROUGH MUNICIPAL AUTHORITY.**

**Appeal of EMPORIUM TRUST COMPANY.**

Superior Court of Pennsylvania.

Argued Nov. 15, 1979.

Filed July 24, 1981.

Petition for Allowance of Appeal Granted Sept. 2, 1981.

144

Judith Fellheimer, Philadelphia, for appellant.

Daniel Krause, Pittsburgh, for Himes, New Enterprise, Stone and Lime and Patton Lumber, appellees.

E. J. Strassburger, Pittsburgh, did not file a brief on behalf of Allegheny Foundary, appellee.

Sanford Anderson, Pittsburgh, for Cambria Slag, appellee.

Gary C. Horner, Johnstown, did not file a brief on behalf of Pennsylvania Electric, United Survey and Warren Concrete, appellees.

E. W. Tompkins, II, Emporium, did not file a brief on behalf of Cameron County Construction, appellee.

Thomas A. Swope, Jr., Ebensburg, did not file a brief on behalf of Carrolltown, appellee.

Before CERCONE, President Judge, and MONTGOMERY and LIPEZ, JJ.

MONTGOMERY, Judge:

The appeal in this case arises from an interpleader action instituted by the Carrolltown Borough Municipal Authority (hereinafter referred to as the "Authority"), as a result of a public works project. The work on the project was done by the Cameron County Construction Corporation (hereinafter referred to as "Contractor"). Pursuant to its contract[1] with the Contractor, the Authority withheld 10% of the agreed contract price, a sum of almost $44,000. That sum constitutes the fund in dispute in this case. One of the claimants was the Emporium Trust Company (hereinafter referred to as the "Bank"), which had loaned money to the Contractor to finance its work on the project. The Contractor had not completed its repayments to the Bank on the loan. In opposition to the claim of the Bank, claims were asserted by a group of several persons and business entities which provided labor and material to the Contractor for the project. The members of this latter group will be referred to collectively herein as the "Suppliers". The lower court determined that the Suppliers should prevail and were entitled to

1. An Opinion for affirmance was originally filed in this case on May 16, 1980. Subsequently, the Appellant Emporium Trust Company filed a Motion for Reargument, arguing, in part, that the contract between the Authority and the Contractor were never placed in evidence. We granted reconsideration and remanded the case to the lower court for clarification on the issue of whether or not the contract had ever been placed in evidence. Upon remand, the lower court, in a detailed Opinion, explained that while the total contract was never made a formal exhibit in the case, many parts of the contract were referred to the court by the parties, without objection by any party. Among those contract provisions referred to the lower court were the sections we rely upon in this Opinion. The lower court also reported in its Opinion that it considered all such sections, and noted that the Appellant Bank referred to and relied upon the disputed contract in its brief to the lower court. Therefore, we find no basis for a different result in this case on the ground that the contract was never formally entered into evidence.

the fund held by the Authority after the completion of the project. The Bank has appealed the lower court's rejection of its claim to a priority right to that fund.

A more detailed review is appropriate of what appear to be the undisputed facts of record. On October 18, 1972, the Contractor was awarded a construction contract by the Authority to construct sanitary sewers and related construction projects. The Contractor borrowed ninety five thousand eight hundred seventy dollars and seventy five cents ($95,870.75) from the Bank in order to begin work on the project. Simultaneously, the Contractor made an assignment of and granted a security interest in the proceeds of the contract to the Bank, as collateral for the loan. The Bank thereafter, in October and November, 1972, filed financing statements, pursuant to the provisions of the Uniform Commercial Code, 12A P.S. § 9–101 et seq., in the offices of the Prothonotary of Cambria County and the Department of State of the Commonwealth of Pennsylvania.[2]

Pursuant to the requirements of the Public Works Contractors Bond Law of 1967, December 20, 1967, P.L. 869, 8 P.S. § 191 et seq., the Contractor obtained a bond from the Summit Insurance Company (hereinafter referred to as the "Insurer"), to insure the payment of bills from suppliers of labor or materials to the project.

In October, 1973, the Contractor commenced work on the project, which was completed in late November, 1974. At the time of the completion of the project, the Contractor owed the Bank more than $88,000 in principal and accumulated interest. The Authority had in its possession the sum of $43,694.50 representing the final payment due to the Contractor, which had been held pursuant to the following provisions of the construction agreement:

"In making partial payments there shall be retained 10% of the amount of each payment until final completion and

2. While the lower court indicated in its Opinion that it was unclear whether the Bank filed with the Commonwealth, this fact was clearly a part of a stipulation among all parties in the lower court.

acceptance of all work covered by the contract ... The entire balance found to be due the Contractor including retained percentages but excepting such sums as may be lawfully retained by [Authority] shall be paid to the Contractor. Such payments shall be conditioned, however, upon submission by the Contractor of evidence that all claims for labor, material and any other outstanding indebtedness in connection with this contract has been paid."

The contract further provided:

*"Payments Withheld.* The Engineer [for the Authority] may withhold or, on account of subsequently discovered evidence, modify the whole or part of any estimate to such extent as may be necessary to protect [Authority] from loss on account of ... (c) Failure of Contractor to make payments properly to subcontractors or for material or labor."

As is evident from the facts recited thus far, the Contractor paid neither the Bank nor several Suppliers. While the Insurer would ordinarily have covered the Contractor's debts to the Suppliers, the record shows that on May 28, 1975, the Insurer became insolvent and was placed in liquidation in the State of New York.

Cloyd Himes, a supplier, brought suit in assumpsit against the Contractor and obtained a judgment on September 27, 1975.[3] Himes then served the Authority with attachment proceedings and the Authority, in turn, filed for Interpleader relief pursuant to Pennsylvania Rules of Civil Procedure 2301 *et seq.* The Authority interpleaded all known creditors of the Contractor. Some of the creditors who were joined were later dismissed from the action for failure to file claims. On May 14, 1976, a hearing was held before the Court of Common Pleas of Cambria County. At that hearing, all counsel present agreed that there were no disputed

---

**3.** In addition to the judgment obtained by Himes, it appears that New Enterprise Stone and Lime Company has reduced its claim to judgment against the Contractor and further, that Cambria Slag Division of the Standard Slag Company has obtained a judgment against Summit Insurance Company.

issues of fact before the Court. Each of the claimants submitted claims to the Court and the factual content of each claimant's claim was stipulated as correct by each of the remaining claimants. Thereafter, the lower court ordered that the Suppliers, rather than the Bank, should receive the remaining fund of $43,694.50 from the Authority. Subsequently the Bank filed the instant appeal in our Court.

The Appellant Bank claims that Article 9 of the Pennsylvania Uniform Commercial Code [4] requires that it be accorded priority among the various claimants to the "proceeds" of the construction contract. Further, the Appellant argues that the lower court erred in placing reliance upon the decision in *Jacobs v. Northeastern Corp.*, 416 Pa. 417, 206 A.2d 49 (1965), to support its order that the Suppliers were entitled to the fund in dispute in this case. Appellees do not deny that the Bank had a perfected security interest in the "proceeds" of the contract. However, they maintain that the fund in question never became "proceeds" to which the Bank could be entitled. After careful consideration of the facts and applicable law, we agree with the lower court and the Appellees.

Any analysis of this problem requires an initial review of the terms of the assignment from the Contractor to the Bank, on which the latter's asserted security interest is based. The terms of that assignment provide:

> [Contractor] does hereby transfer, set-over, and assign to The Bank, its successors and assigns, all moneys that are now, or may hereafter become due and payable to [Contractor] by [Authority] . . . under a contract between [Contractor] and [Authority] . . . for the construction of
> . . .

The assignment reveals that the only "moneys" in which the Bank had a security interest were those which ". . . now or hereafter become due and payable . . ." to the Contractor. Of course, the Contractor could not assign to the Bank any greater right than that which the Contractor itself possessed

---

4. Act of October 2, 1959, P.L. 1023, as revised and reenacted, 12A P.S. § 9–101 *et seq.*

or would attain under the agreement with the Authority. Thus, the logical next step in an analysis of the rights of the parties in this appeal is to determine the Contractor's right to the disputed fund, since the Bank's rights in this matter are necessarily derivative of those of the Contractor with respect to such "moneys".

In our recitation of facts earlier in this Opinion, we detailed the relevant portions of the construction contract, which *inter alia,* gave the Authority the express power to withhold final payment of the retained 10% fund on account of a failure of the Contractor ". . . to make payments properly to subcontractors or for material or labor." Moreover, as previously indicated, the same contract also provided that payment of that fund would be conditioned upon submission of evidence by the Contractor that all claims for ". . . labor, material or any other outstanding indebtedness in connection with this contract has been paid."

The Appellant Bank has argued forcefully on this appeal that it has a priority right to the withheld funds under article 9 of the Pennsylvania Uniform Commercial Code. It relies upon several provisions of that Act dealing with the priority of secured versus unsecured creditors. However, the Bank does not discuss Sections 9–204 or 9–306, which we find pertinent here. Section 9–204 (12A P.S. § 9–204) explains when a security interest attaches, and expressly provides:

> (1) A security interest cannot attach until there is agreement (subsection (3) of Section 1–201) that it attach and value is given *and the debtor has rights in the collateral.* It attaches as soon as all of the events in the preceding sentence have taken place unless explicit agreement postpones the time of attaching. (emphasis supplied)

As is clear from the terms of the construction contract, the Contractor (the "debtor" in the context of the Code) was *not entitled* to the final 10% payment until it submitted evidence that it had satisfied the proper claims of suppliers of labor and material. Since the Contractor, as "debtor", never

satisfied its contractual obligations in that regard, it never gained "rights in the collateral", and the security interest of the Bank therefore never attached.[5] Section 9–306 (12A P.S. § 9–306) also provides support for that conclusion. That Section, *inter alia*, defines "Proceeds" as including "... the account arising when the *right to payment is earned* under a contract right." (emphasis supplied) In the instant case, while the Bank asserts that it has a clear security interest in the "proceeds", in fact no such "proceeds" technically exist so far as the Contractor or the Bank are concerned. This is so because the Contractor, having not paid the Suppliers, did not have any "right to payment" as is required in the Code. Thus, Sections 9–204 and 9–306 both mitigate against the Bank's claim in this case.

A highly analogous situation to that presented in the instant appeal was before the Supreme Court in *Jacobs v. Northeastern Corp., supra,* upon which the lower court placed reliance in this case. There the construction company entered into contracts under which it agreed to complete public projects for two state agencies. Both contracts called for bonds to guarantee that suppliers of material and labor would be paid. As in the instant case, the contractor failed to pay some suppliers, but unlike the situation here, the bonding companies, as sureties, made payments in compliance with the bonds. The construction company was placed in receivership and the sureties then petitioned the court for distribution to them of the final payments under the construction contracts, which payments were then still due and owing. The appointed receiver resisted such petitions and sought the retained funds for general distribution, claiming that the sureties were merely general creditors along with all other creditors. The Court held that the construction contracts impliedly provided for the retention of final payments by the state agencies to cover any failures of payment

5. We also note that § 9–303 (12A P.S. § 9–303), regarding when a security interest is perfected, states: "A security interest is perfected when it has *attached...* "

by the contractor to suppliers of labor and materials.[6]  In such circumstances, the Court held that the sureties were entitled to receive the disputed funds on the basis of the doctrine of subrogation and as successors to the rights of the contractor.

The receiver in *Jacobs* argued that the sureties were merely holders of unperfected security interests since they failed to file financing statements pursuant to Article 9 of the Uniform Commercial Code.  In rejecting that argument, the Supreme Court directly answered the questions before our Court in the instant case:

"The contract balance withheld would never have become due and payable to Northeastern (or its receiver or creditors) as long as Northeastern defaulted on its obligation to pay labor and materialmen.  *Payment of the retained balance became due and available only upon performance by the sureties of Northeastern's obligations.  It is clear that all labor and material claims must be fully discharged before there is entitlement to the full contract payment.*  In all respects, the result so far as Northeastern and its creditors are concerned is precisely the same whether the sureties satisfy the unpaid laborers and materialmen, *or whether the Commonwealth directly pays the claimants out of the retained funds.*  (emphasis added.)  416 Pa. at 428, 206 A.2d at 54.

As in *Jacobs,* we have concluded that the Contractor was never entitled to the funds retained by the public body because the obligation to pay Suppliers had not been satisfied.

The same result, based upon identical rationale, was reached by the United States Supreme Court in *Pearlman v. Reliance Insurance Company,* 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962).  In that case, the United States contracted with Dutcher Construction Corporation to do work on the St. Lawrence Seaway project.  The contractor was required

---

**6.**  In the instant case the applicable contract provides *expressly* for the retention of the final payment by the Authority for the same purposes.

to provide bonds to secure payments to labor and material suppliers, and the contract also authorized the Government to retain a percentage of the contract price to assure complete performance by Dutcher. The contractor failed to pay its suppliers, and eventually was adjudged bankrupt. The bonding company paid the suppliers and the suit involved a dispute between the trustee in bankruptcy and the bonding company for the final proceeds of the construction contract retained by the Government. The Court ruled that the surety was entitled to the fund, reasoning that the trustee obtained only those rights which the bankrupt had *at the time of the adjudication*. The Court consequently declared, at 371 U.S. at 141, 83 S.Ct. at 237:

> We therefore hold in accord with the established legal principles stated above that the Government had a right to use the retained fund to pay laborers and materialmen; that the laborers and materialmen had a right to be paid out of the fund; that the contractor, had he completed his job and paid his laborers and materialmen, would have become entitled to the fund; and that the surety, having paid the laborers and materialmen, is entitled to the benefit of all these rights to the extent necessary to reimburse it.

On the same rationale we hold that the Bank never gained any rights to the disputed fund in the instant case because the Contractor never attained such rights. Thus, the Bank has no security interest whatsoever on which to base its claim.

Earlier in this Opinion, at footnote 1, we noted that the Appellant Bank had filed an Application for Reargument. In addition to taking the position that the construction contract was never placed in evidence before the lower court in this case, the Appellant also contended that our previously issued decision and order of affirmance in this case was in conflict with the decision issued by another panel of this Court in *B. Bornstein & Son, Inc. v. R. H. Macy & Co.*, 278

Pa.Super. 156, 420 A.2d 477 (1980).[7]  We find no merit to that contention, as it is evident that there are significant factual and legal differences in the two cases.

In *Bornstein*, a construction contract existed between two *private* parties—a construction company and a developer—for the building of a department store.  The contract required the construction company to present the developer with evidence that sub-contractors and suppliers had been paid, and with documents signed by sub-contractors and suppliers releasing all liens, before the developer had to pay the construction company the last payment on the contract.  The construction company failed to deliver such evidence or documents and the developer refused to make the final payment.  A suit was filed by the construction company against the developer to recover the payment.  In turn, the developer interpleaded judgment creditors of the developer and unpaid sub-contractors and suppliers from the project, who also sought part of the balance due on the contract.

Our Court found that there had been no material breach by the construction company in failing to provide evidence of payments or lien release documents because the statutory time period had expired during which any liens could be legally filed against developer's property as a result of the construction company's failure to make payment to any party.  Significantly, our Court found in *Bornstein* that the clauses in the contract requiring that evidence of payments and no-lien documents be presented to the developer were inserted for the developer's *own* protection.  Since the time period for the filing of such liens has passed, the developer had no potential to lose anything by the payment of the balance due to the construction company.

Our Court further found that the judgment creditors of the construction company had the right, in its place, to the unpaid balance, and reached the conclusion that the developer had no duty under the contract to pay the subcontractors and suppliers on their claims.  It was also determined that

7.  Allocatur was granted by the Supreme Court in the *Bornstein* case on December 12, 1980.

they were not third party beneficiaries under the contract and that there was no "equitable obligation" on the part of the developer to make them whole.

The differences between *Bornstein* and the instant case are apparent. In *Bornstein*, the construction company was entitled to the final payment as its failure to provide evidence of payment to sub-contractors and suppliers was not a material breach. As noted earlier, this was so since the relevant contract provisions in *Bornstein* were designed to protect the *private* developer against liens; when such liens could no longer be asserted, the protection provided by such clauses was no longer necessary. The judgment creditors in *Bornstein* enjoyed rights which were derivative to those of a party *entitled* to the fund, while the Appellant Bank in the instant case had *no* rights derived from any party having any entitlement to the retained portion of the contract payment. Thus, the Bank, in the instant case, may not be analogized to the judgment creditors in *Bornstein*.

We also find that the Suppliers in this case cannot be found to have been in the same legal position as the sub-contractors and suppliers in *Bornstein*. In the instant case, we find that the retained fund was expressly provided to protect those who supplied material and labor to the Contractor on a *public works* project. We note similar findings by the courts in *Jacobs, supra,* and *Pearlman, supra,* both of which involved public works projects. See also footnote 6 in *Bornstein*, 278 Pa.Super. at 171, 420 A.2d at 484. As discussed above, the clause present in the *Bornstein* case, for a retention of final payment, was designed to protect the private developer from liens, and not the sub-contractors and suppliers. Thus, the Suppliers in the instant case enjoyed a different status merely because of the public nature of the project.

For all of these reasons, we reject the contention of the Appellant that any conflict exists between our decision in the instant case and that issued by this Court in *Bornstein*. It is clear that the Appellee Suppliers are the proper distributees under the facts of record and applicable law in the

instant case, and that the Appellant has no rights to the disputed fund.

Affirmed.